McGillicuddy All right, we appear to have everybody on board for case number five, Robert McGillem against Commissioner Kijakazi, Acting Commissioner of the Social Security Administration, 22912. And we will begin with you, Mr. Richter. Thank you, Your Honor, and may it please the court. As a preliminary matter, let me apologize. My camera keeps going black every 30 seconds or so, so I wanted to excuse myself for that. But the outcome-determinative question in this case at hearing, per the agency contracted vocational experts' testimony, was whether appellant would experience fecal incontinence in the workplace, quote, more than a couple of times. The ALJ concluded a residual functional capacity, which answered that question in the negative here, and accounted for not even a single occurrence of incontinence as part of that residual functional capacity, let alone the logical time off task which would ensue were such an event to occur. So am I correct, Mr. Richter, that the ALJ, this is on the remand, essentially dismisses the incontinence issue on the ground that Mr. McGillem wasn't compliant with his physician's recommendations, and that when he was compliant, it wasn't a problem. And so I thought that that was all the ALJ said about it. Then the rest of the ALJ's opinion is all about fibromyalgia and other things, and it's not until we get to the district court that we have a much more fulsome description of the incontinence issue. So are you arguing that you can't dispose of this medical issue just by saying – I guess I'm looking in particular at page 4. He says, hence I find that the irritable bowel syndrome is amenable to treatment, which makes this a slight abnormality that would have no more than a minimal effect on an individual's ability to work. And then I think that's the last you hear of the incontinence issue in this opinion, in which case we need to focus on that to see if that's a legitimate way of reasoning. Well, Your Honor, that is all the ALJ really said about this issue in his decision. And you're not pursuing fibromyalgia anymore here, right? That's not – yeah, that's not a material issue in this particular case, no. And so what I would say here is that the issue with what the ALJ did is not in considering appellant's credibility or his regimen, his diet, those sorts of things. The problem is, is that the ALJ ignored the objective evidence, which supports – which goes against or contradicts his conclusion that appellant could simply control this issue with his diet or that it was merely a minor issue. Well, it was a regimen, right? He wanted – or apparently the doctors had said, you know, you need to eat smaller meals spread through the day and you need to take this medication before you eat and you have to increase your fiber or the loperamide. You have to increase your fiber and you also have to stop drinking the Pepsis. And so what the ALJ seems to be saying is if he had done all of those things, he would have no problem. That's what the ALJ has said, but unfortunately that's not what the doctors said. They said that certainly his diet and his intake of carbonated beverages would exacerbate or could be an exacerbation of his accidents and that sort of thing. But the underlying medical issue here is shown via objective neurological testing. This was a neurological issue. It wasn't merely a dietary issue. He – the appellant demonstrated dyssynergic defecation was the diagnosis after abnormal anorectal manometry testing in June of 2014. As well as a 2015 CT scan of the small bowel that indicated localized ileus. The medical expert who testified at the hearing, Dr. Fisher, stated that dyssynergic defecation, the objective diagnosis from the objective testing, represents a colonic nerve impairment which caused appellant to have trouble knowing that he's going to have a bowel movement. And the problem here, Your Honor, is that the judge did not even mention this in his decision. He did not confront any of this evidence which suggests that no, it wasn't simply appellant's diet or his consumption of carbonated sodas that was causing this. It was a neurological condition. So can I then ask, are you arguing essentially that the ALJ's failure to account for the medical testimony showing that it was a colonic nerve problem, showing that just having more fiber in your diet and so on wasn't going to be enough to solve the problem. That sounds like a procedural argument that the ALJ's explanation for the bottom line, which was that this wasn't any kind of impediment to work, was insufficient. Is that your argument? Right, Your Honor. It's an ignoring evidence argument, ignoring entire lines of evidence which contradicted the residual functional capacity he came up with, which did not account at all for any instance of these events. What then do you do with our standard that an ALJ's assessment of functional limitations is harmless where the claimant hasn't provided evidence on that point? And I don't see here where McGillen provided information about hypothetical work restrictions like breaks or where he points to anything in the medical record about additional restrictions testifying about the frequency or unpredictability or timing of breaks that might help him. Didn't McGillen have some burden here too? Absolutely, Your Honor. It was our burden and I believe we bore that burden here. This is objective testing. It's not an x-ray, but the same way an x-ray shows a broken bone, this manometry testing showed that he has this issue within his small bowel that causes this problem. And he also had these rectal excoriations and rash and this terrible skin issue that he was treating with a dermatologist, which the dermatologist attributed this issue to his fecal incontinence and the instances of that. In addition, we certainly asked the vocational expert about how this would affect his ability to perform. And the testimony that we received from the vocational expert was, even if this didn't take him off task a significant portion of the day, the mere occurrence of fecal incontinence more than a couple of times over the course of his tenure at any job would result in termination. And as a result of this issue. And that was the vocational expert's testimony, just to be clear. That's correct. Yes. I see I'm running awfully low here, so I'll reserve the rest of my time. All right, that's fine. Ms. Brechtelsbauer. Thank you, Your Honors. Erin Brechtelsbauer on behalf of the Acting Commissioner of Social Security. I'd like to begin by addressing a few of Mr. Richter's points there and also pointed out by the court. Mr. Richter jumps to the vocational expert's testimony as supporting his conclusion. But with due respect, he forgets that before we get to the VE's testimony, as the court noted, he has to prove his functional limitations resulting from his medical impairments. Before you get there, though, let me tell you, I am very concerned that the ALJ devotes exactly four lines of his opinion to this issue, which was one of the issues that was particularly highlighted for the remand. And then the court, Magistrate Judge Brookman, does spend quite a bit of time on it. But as you well know from the Chenery Doctrine and other things, the court can't fill in gaps that the ALJ has left behind. And I'm very concerned that the ALJ's opinion doesn't grapple with quite a bit of the evidence in this record that Mr. McGillum proffered to show that this was going to be sporadic enough and unpredictable enough and the kind of thing that an employer simply wouldn't, as the VE said, wouldn't tolerate on the job. But there's a lot of medical evidence that this wasn't just a question of, you know, taking a lot of Metamucil. Well, I'll address your point in two points, Your Honor. To clarify, the ALJ did dedicate more than four lines. Ahead of those conclusion lines, he does discuss Mr. McGillum's history of a small bowel obstruction, his intermittent reports of improvement with treatment, his failure to attend to his treatment regimen, as Your Honor has noted, and his physicians note that if he did comply with treatment, there was room for improvement. This is both before and after his official neurological diagnosis. So the ALJ did grapple with much of the medical evidence. But there's a lot he doesn't. I mean, you're talking about this discussion on page four that precedes the four lines where, you know, there's a little bit of a summary. But there's nothing about, you know, the nerve. There's nothing about ability to control. And there's nothing about the fact that even though there may have been times that it wasn't as severe, that it always came back. Well, I believe, Your Honor, that the ALJ's discussion does show it continued to bother Mr. McGillum, again, but also shows his lack of treatment compliance. As far as the diagnosis, while the ALJ doesn't explicitly note the diagnosis, this Court has said, as Mr. McGill notes, that an ALJ need not mention every piece of evidence as long as the ALJ does not ignore an entire line of evidence. Well, that's right. But you can't ignore important things. And the thing that's so telling is the contrast between the district court's opinion about all of this. The district court goes into great detail about this whole problem. And that's not in the ALJ's opinion. Well, with due respect, the district court only had this issue to deal with. The ALJ had before him a 3,000-page record, which is large even by Social Security standards, and had a number of issues, including fibromyalgia, alleged migraines. Only three, though, at this stage, because it had been narrowed down to just those three things. Well, actually, Your Honor, the ALJ has to address the entire record. It's not just the elements on remand. They look at the case anew. So he had to go through all of those records and all of the alleged impairments, including mental impairments. So it was not just this issue that he had to talk about or just the three issues that were brought on the initial remand. This was one of many, and minor in comparison to a lot of the records, which primarily focused on Mr. McGill's mental impairments. And as the ALJ noted later in his decision, which he does specifically relate to Mr. McGill's bowel issues, Mr. McGill did not bring this issue up until his initial district court appeal. It was not in any of his documents submitted to the agency as far as why he believed he was disabled. Indeed, even in his testimony before the first ALJ, he didn't mention it. And in his testimony before this ALJ, he didn't mention it as a reason he could not work. Mr. McGill's counsel now said it's because he doesn't recognize the vocational significance, which sounds like large shirts. But it's really just whether or not this would impact his ability to work. And with due respect, someone with the amount of incontinence Mr. McGill now alleges would certainly recognize if it impacted his ability to work. He never testified as to losing a job related to it. He did testify that he had this condition throughout his life since at least he was a teenager and was even admitted to the military with it without restrictions. And that is something the ALJ noted is that he did not bring it up in his initial documents to the agency as a reason for his disability. And that's something that under, excuse me, under Social Security Ruling 16-3P, the ALJ was entitled to consider previous statements to the agency. And as far as his discussion of the diagnosis itself, while it is true the ALJ must discuss pertinent evidence that impacts functional limitations and shows something that may contradict the ALJ's decision, with due respect, here the diagnosis is not that. It's merely a diagnosis. No doctor opined that it meant that Mr. McGill's alleged incontinence was not susceptible to treatment. In fact, Dr. Fisher was a medical expert that the ALJ called specifically to go through all of Mr. McGill's medical records. And he recognized that Mr. McGill had irritable bowel syndrome and fetal incontinence, but that it was improved. And he opined that based on his complete review of the medical records, including the diagnosis and all of the other evidence, which is minimal that Mr. McGill highlights in his brief, that Mr. McGill could still perform a range of light work that was actually broader than the ALJ's ultimate residual functional capacity assessment. Meaning the ALJ's determination as to Mr. McGill's residual functional capacity was the most limited in the record. But it didn't have anything to do with this issue, though. It was based on his very detailed assessment of the fibromyalgia, his detailed assessment of the alleged mental limitations. That's what the ALJ's opinion focuses on, not this. Well, it focuses on those issues, yes, but it also does address Mr. McGill's incontinence, his alleged incontinence. On page 4. Indeed, but again, this court will consider the ALJ's decision as a whole. It's not particularly important where in the decision it's discussed, and he does devote nearly a whole page to the issue. He doesn't find it's a severe impairment, though. The only severe impairments he finds are listed in that boldface paragraph 3. That is true, Your Honor, but as this court has recognized in many cases, that step 2, severity versus non-severe medical impairments, is merely a threshold inquiry to move to the next step, to step 3. And an ALJ, as the ALJ here, will consider all of the claimant's impairments in assessing their residual functional capacity and consider symptoms and the functional limitations arising from those impairments. So simply because he did not find it was a severe impairment does not mean he didn't include it in his consideration. He did not find specific functional limitations, but again, that was Mr. McGill's burden to prove he had specific functional limitations. He had no testimony that he needed additional breaks or time off tasks. The only testimony on that was from the VE regarding a hypothetical individual that Mr. McGill's counsel created, and it was not Mr. McGill. He created, based on his own words, was, excuse me, let me get the testimony, totally arbitrary that this person would need numerous and 15-minute break at any given time throughout the day. Should we be troubled, though, that the ALJ doesn't discuss any of Mr. McGill's testimony on this? I mean, the ALJ doesn't have to specifically address any testimony in discussing, he doesn't have to discuss any specific elements of Mr. McGill's testimony. He does discuss his subjective reports to his treatment providers. And again, Mr. McGill's testimony on this was somewhat equivocal. He didn't testify he lost a job for this. He didn't testify that he needed breaks to deal with this. Honestly, his testimony would help the ALJ if he would have discussed it more. It shows that Mr. McGill didn't even wear a pad for incontinence, which, again, doesn't he say that he solved the problem by changing his clothes three or four times a day? He mentioned he did that when he previously worked, but that it didn't impede his ability to work. And so, again, he didn't testify. I mean, most people don't do that. Let's be fair. I mean, changing your clothes three or four times a day is indicative of a problem. It could be, Your Honor, if the ALJ found Mr. McGill's comments to be solely reliable. But as we discussed in our brief, the ALJ gave numerous reasons why Mr. McGill's subjective reports of his symptoms and the severity of those symptoms was not entirely reliable. And I see I'm out of time, Your Honor, so I would just ask the court that we rest on our brief and affirm the ALJ's decision. Thank you. All right. Thank you very much. Anything further, Mr. Victor? Shortly, Your Honor. I would just say that I'm sure that this matters, but I do a lot of these cases, and as we're talking about allegations and corroboration and proving your limitations, when I think of an impairment that is such a sensitive and private matter, I can't think of any more evidence that Mr. McGill could provide to show that he would experience this fecal incontinence at some point while working. I mean, you have objective testing of his neurological system within his bowels. He has this excoriation problem that demonstrates this is happening to him, and he doesn't even know it. And it's causing a terrible skin irritation and problem for him. Well, it's essentially adult diaper rash. Yes. Basically, yeah. Okay. Well, I see that I'm out of time. I would just ask that the court remand so that the ALJ can actually consider those items of objective corroboration of his allegations. Thank you. All right. Thank you very much. Thanks to both counsel. We will take this case under advisement.